KATHLEEN M. WILLIAMS, UNITED STATES DISTRICT JUDGE
THIS MATTER is before the Court on four pending motions to dismiss: (1) Defendant Mercedes-Benz USA, LLC's ("MBUSA['s]" and, collectively with Defendant Daimler AG,[1] "Mercedes Benz['s]") FRCP 12(b)(1) and 12(b)(6) motions to dismiss (DE 78; Response DE 97; Reply DE 104); (2) Defendant American Honda Motor Co., Inc.'s ("Honda['s]" and, collectively with MBUSA, "Automobile Manufacturer Defendants[']") motion to dismiss under Rules 12(b)(1), 12(b)(2), and 12(b)(6) (DE 82; Response DE 98; Reply DE 106); (3) Defendant Atmel Corporation's ("Atmel['s]") motion to dismiss Plaintiffs' claims under FRCP 12(b)(1), 12(b)(2), 12(b)(6), and 12(b)(7) (DE 83; Response DE 99; Reply DE 105); and (4) Defendant Continental Automotive Systems, Inc.'s ("Continental['s]" and, collectively with Atmel, "Airbag Manufacturer Defendants[']") motion to dismiss (DE 87; Response DE 100; Reply DE 108). The Court heard argument on all four motions at a hearing held on September 9, 2016. For the reasons *1209 discussed below, the motions to dismiss (DE 78; DE 82; DE 83; DE 87) are GRANTED.
I. BACKGROUND
This case is about defective airbag control units ("ACUs") that are featured in an unascertained number of vehicles across the United States. As of September 8, 2016, 630,004 vehicles in the United States were subject to a "warning or recall" related to the defective ACUs. (DE 50 ¶ 1; see also DE 121 at 1). According to the National Highway Traffic Safety Administration ("NHTSA"), which initiated a preliminary investigation into the defective ACUs in August 2015, up to five million vehicles in the United States may eventually be subject to such warning or recall. (DE 50 ¶¶ 12, 19).
A properly functioning ACU "controls the airbag and other safety systems, including seatbelt pre-tensioners" within a vehicle, and causes these systems "to deploy rapidly during an automobile collision." (DE 50 ¶ 3). But a faulty electrical connection within the power supply component ("ASIC")[2] of the defective ACUs at issue in this case causes the "airbags and other safety systems not to deploy during crashes" (DE 50 ¶ 11) as well as "unexpected deployments" of the airbags and other safety systems (DE 50 ¶ 9). Honda and Mercedes Benz manufacture vehicles containing the defective ACUs, including the 2008, 2009, and 2010 model Honda Accord and the 2008 and 2009 model Mercedes Benz C Class. (DE 50 ¶ 1). Continental manufactures the defective ACUs (DE 50 ¶¶ 15, 77) and Atmel supplies Continental with the ASIC that is allegedly the source of the defect (DE 50 ¶¶ 6, 78). Plaintiffs are thirteen individuals who purchased vehicles containing the defective ACUs.[3] Three purchased vehicles manufactured *1210 by Mercedes Benz, six purchased vehicles manufactured by Honda, and four purchased vehicles manufactured by non-party FCA US LLC.
Plaintiffs purport to be the class representatives for a nationwide class (DE 50 ¶ 96), a Florida sub-class (DE 50 ¶ 97), a New Jersey sub-class (DE 50 ¶ 98), a Michigan sub-class (DE 50 ¶ 99), and a Louisiana sub-class (DE 50 ¶¶ 100). Their Complaint alleges that Defendants knew about the defective ACUs well before they disclosed this knowledge to NHTSA in late 2015 and early 2016. (DE 50 ¶¶ 6-18). Specifically, it alleges that Continental manufactured the defective ACUs from at least 2006 through the end of 2010, and that Continental, Atmel, and MBUSA became aware of the defective ACUs in January 2008 after "Continental ... received an air bag control unit that Mercedes Benz ... removed from a vehicle whose owner complained of an illuminated airbag warning light." (DE 50 ¶ 6). After Continental examined this unit and determined the ASIC to be the source of the defect, it sent the ACU to Atmel, which determined that "corrosion in the ASIC's semiconductor material could cause interruptions in electrical connections in the ASIC, leading to failure of the ASIC component." (DE 50 ¶ 6). Continental and Atmel then "allegedly implemented countermeasures to prevent the defect from continuing" but "these countermeasures failed, if they were implemented at all." (DE 50 ¶ 7).
The Complaint also alleges several other events in the years between 2008 and 2015 which suggest that Defendants had knowledge of the defective ACUs before disclosing the defects to NHTSA (DE 50 ¶¶ 13-14):
• In early 2011, Continental, Atmel, Mercedes Benz, and non-party FCA US LLC "became aware of two unexpected deployments of airbags and other safety systems" in vehicles featuring the defective ACU. (DE 50 ¶ 9).
• In March 2013, Mercedes Benz, "based on its actual knowledge" of the defective ACUs, "initiated a campaign outside the U.S. to address" the defective ACUs but "failed to take similar action" in the United States. (DE 50 ¶ 10) (emphasis in original).
• In early 2014, Continental "was named as a defendant in a suit relating to the recall of millions of General Motors-manufactured vehicles as a result of a defect that potentially caused Continental-manufactured *1211 airbags in those vehicles not to deploy." (DE 50 ¶ 15).
• In late 2014, "Audi recalled approximately 850,000 vehicles as a result of a different defect in Continental-manufactured airbags that also potentially caused the Continental-manufactured airbags not to deploy." (DE 50 ¶ 15).
• In early 2015, Continental, Atmel, and Honda "became aware of additional cars" with defective ACUs that "caused airbags and other safety systems not to deploy during crashes," including one Honda vehicle "involved in an accident in 2013" that was the subject of a lawsuit against Honda and another Honda vehicle "involved in an accident in 2015" that was "the subject of a complaint" to NHTSA. (DE 50 ¶ 11).
• Finally, in August 2015, NHTSA began its investigation into the "scope, frequency, and consequence" of the defective ACUs in Honda-manufactured vehicles. (DE 50 ¶ 12).
Accordingly, Plaintiffs contend that even though Continental, Atmel, and Mercedes Benz knew about the defective ACUs "by 2008, at the latest" (DE 50 ¶¶ 17, 87) and that Honda knew about the defective ACUs "by early 2015, at the latest" (DE 50 ¶¶ 18, 87), Defendants "concealed their knowledge of the nature and extent of the defects from the public" (DE 50 ¶ 25).
On these facts, the Complaint advances-on behalf of various classes and sub-classes-four causes of action against MBUSA, five causes of action against Honda, ten causes of action against Continental, and thirteen causes of action against Atmel:
• Count 1 on behalf of a nationwide class against all Defendants for violations of the Magnuson-Moss Warranty Act ("MMWA");
• Count 2 on behalf of a nationwide class against all Defendants for fraudulent concealment;
• Count 3 on behalf of a nationwide class against the Airbag Manufacturer Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO");
• Count 4 on behalf of a Florida sub-class against all Defendants for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA");
• Count 5 on behalf of a Florida sub-class against all Defendants for fraudulent concealment;
• Count 6 on behalf of a New Jersey sub-class against Continental, Atmel, and Honda for violation of the New Jersey Consumer Fraud Act ("NJCFA");
• Count 7 on behalf of a Michigan sub-class against Continental and Atmel for violation of the Michigan Consumer Protection Act ("MCPA");
• Count 8 on behalf of a Michigan sub-class against Continental and Atmel for silent fraud;
• Count 9 on behalf of a Michigan sub-class against Continental and Atmel for fraud;
• Count 10 on behalf of a nationwide class against Atmel for violations of the California Unfair Competition Law ("CUCL");
• Count 11 on behalf of a nationwide class against Atmel for violations of the California False Advertising Law ("CFAL");
• Count 12 on behalf of a nationwide class against Atmel for violations of the California Consumers Legal Remedies Act ("CLRA"); and
• Count 13 on behalf of a Louisiana sub-class against Continental and Atmel for fraudulent concealment.
*1212 Based on these causes of action, Plaintiffs request myriad relief, including: (1) certification of all proposed classes and subclasses; (2) a declaration that the defective ACUs were in fact defective; (3) a declaration that Defendants are financially responsible for notifying all class members about the defective nature of the vehicles containing the defective ACUs; (4) an injunction preventing Defendants from "further deceptive distribution, sales, and lease practices" with regards to vehicles containing the defective ACUs and requiring Defendants to "permanently, expeditiously, and completely repair" vehicles containing the defective ACUs and eliminate the defective ACUs; (5) compensatory, exemplary, and statutory damages; (6) damages for the return of the purchase prices of all vehicles containing the defective ACUs and the reasonable expenses occasioned by sale; (7) establishment of a Defendant-funded program under which out-of-pocket expenses and damages claims associated with the defective ACUs can be made and paid; (8) a declaration that Defendants disgorge "all or part of the ill-gotten profits received from the sale or lease of vehicles containing the defective ACUs; (9) attorneys' fees and costs; (10) pre-judgment and post-judgment interest; and (11) permission to amend the Complaint "to conform to the evidence produced during discovery and at trial." (DE 50 at 68-70).
II. LEGAL STANDARD
" Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction can be asserted on either facial or factual grounds." Carmichael v. Kellogg, Brown & Root Serv., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009). Where a defendant levies a factual attack, the trial court is free to consider matters outside the pleadings-such as testimony and affidavits-in order to determine whether it has the power to hear the case. See Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). While "a district court has wide discretion to determine the scope of [jurisdictional] discovery, a plaintiff must have ample opportunity to present evidence bearing on the existence of jurisdiction." Colonial Pipeline Co. v. Collins, 921 F.2d 1237, 1243 (11th Cir. 1991) ; see also In re CP Ships Ltd Sec. Litig., 578 F.3d 1306, 1312 (11th Cir. 2009) ("In a factual challenge, the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss.") (citation omitted). In contrast, "[o]n a facial attack, a plaintiff is afforded safeguards ... [and] the court must consider the allegations of the complaint as true." Lawrence, 919 F.2d at 1529.
On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Court accepts as true all allegations in the complaint to determine whether the plaintiff has met his burden of establishing a prima facie case of personal jurisdiction. See Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006). "A prima facie case is established if the plaintiff puts forth enough evidence to withstand a motion for a directed verdict." Id. (quotation marks and citation omitted). The Court engages in a two-part analysis to determine if it may exercise jurisdiction over a non-resident defendant. See Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339, 1350 (11th Cir. 2013) (citing Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1319 (11th Cir. 2004) ); Virgin Health Corp. v. Virgin Enters. Ltd., 393 Fed.Appx. 623, 626 (11th Cir. 2010) (citing United Techs. Corp. v. Mazer, 556 F.3d 1260, 1274 (11th Cir. 2009) ); Cable/Home Commc'n Corp. v. Network Prods., Inc., 902 F.2d 829, 855 (11th Cir. 1990) (citations omitted). First, the Court determines whether the defendant's activities satisfy Florida's long-arm statute. See Mosseri, 736 F.3d at 1350.
*1213 Second, the Court determines whether the exercise of peronal jurisdiction comports with the due process requirements of the Fourteenth Amendment. Id. at 1350-51. Separately, if a plaintiff's claim derives from a federal statute, then the court may exercise personal jurisdiction over the defendant as to that claim consistent with the limits of both the statute and the due process requirements of the Fifth Amendment. See Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 948 (11th Cir. 1997).
To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts to state a claim that is "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). The Court's consideration is limited to the allegations presented. See GSW, Inc. v. Long Cty., 999 F.2d 1508, 1510 (11th Cir. 1993). All factual allegations are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention, 623 F.3d 1371, 1379 (11th Cir. 2010) ; see also Roberts v. Fla. Power & Light Co., 146 F.3d 1305, 1307 (11th Cir. 1998). Nevertheless, while a plaintiff need not provide "detailed factual allegations," the allegations must consist of more than "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (internal citations and quotations omitted). "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.' " Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003). The "[f]actual allegations must be enough to raise a right of relief above the speculative level." Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007) (quoting Twombly, 550 U.S. at 545, 127 S.Ct. 1955 ).
In addition to the requirements of Twombly, Iqbal, and Federal Rule of Civil Procedure 12(b), causes of action sounding in fraud-such as "[c]ivil RICO claims, which are essentially a certain breed of fraud claims"-are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007). That rule provides that "[i]n alleging of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Consequently, "[t]o satisfy the Rule 9(b) standard, [fraud claims] must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." Ambrosia Coal, 482 F.3d at 1316-17 (citing Brooks v. Blue Cross & Blue Shield, 116 F.3d 1364, 1380-81 (11th Cir. 1997) ).
III. DISCUSSION
Four of the five named Defendants filed motions to dismiss: Honda, MBUSA, Atmel, and Continental. For the reasons below, the Court grants each motion. The Court considers Honda's motion and MBUSA's motion separately and then discusses Continental's and Atmel's motions-which raise similar legal issues-together.
A. Honda's Motion to Dismiss
The Complaint alleges five causes of action against Honda: Count 1 for violations of the MMWA, Counts 2 and 5 for fraudulent concealment on behalf of a nationwide class and Florida sub-class, respectively, Count 4 for violations of the FDUTPA, *1214 and Count 6 for violations of the NJCFA. Honda argues that the allegations in the Complaint do not establish that it is subject to personal jurisdiction in this Court. The Court agrees and dismisses all claims against Honda without prejudice, pursuant to Rule 12(b)(2).
In determining the existence of personal jurisdiction, the Court assesses whether the defendant's alleged activities satisfy Florida's long-arm statute and whether the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment. See Mosseri, 736 F.3d at 1350-51. Plaintiffs bear the initial burden of establishing a prima facie case of personal jurisdiction. See Stubbs, 447 F.3d at 1360 (citing Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1268-69 (11th Cir. 2002) ).[4] To establish the Court's personal jurisdiction over Honda, Plaintiffs must plead facts sufficient to withstand a directed verdict that Honda is within the reach of Florida's long-arm statute, Florida Statute § 48.193. Id.
Pursuant to the long-arm statute, Florida courts can exercise personal jurisdiction over an out-of-state defendant in two ways. First, Florida courts can exercise general personal jurisdiction over any claims against a defendant-whether or not they involve the defendant's activities in Florida-if the defendant engages in "substantial and not isolated activity" in Florida. Carmouche v. Tamborlee Mgmt., Inc., 789 F.3d 1201, 1204 (11th Cir. 2015). "A foreign corporation cannot be subject to general jurisdiction in a forum unless the corporation's activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business." Id. at 1205. Thus, "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." Id. at 1204 (quoting Daimler AG v. Bauman, 571 U.S. 117, 134 S.Ct. 746, 760, 187 L.Ed.2d 624 (2014) ). Second, Florida courts can exercise specific personal jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida if those contacts fall within one of nine statutorily enumerated categories. Id.
Plaintiffs' Complaint fails to allege facts that establish a prima facie case of either general or specific personal jurisdiction over Honda pursuant to Florida's long-arm statute. The case law that Honda cites makes clear that Plaintiffs must allege much more than they have in the Complaint to establish general personal jurisdiction. In Daimler, the Supreme Court held that Daimler AG, the German parent company of MBUSA, was not subject to personal jurisdiction in California-rejecting the argument that the district court could exercise "jurisdiction over Daimler ... on the California contacts of MBUSA, a distinct corporate entity ... [and] indirect subsidiary." Daimler, 134 S.Ct. at 752-53. In so holding, the Supreme Court condemned "exorbitant exercises of all-purpose jurisdiction" over out-of-state defendants who may have " 'structure[d] their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " Id. at 761-62 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ). After Daimler, "a court may assert jurisdiction over a *1215 foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.' " Id. at 751 (alterations in original) (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) ). Applying Daimler, the Eleventh Circuit in Carmouche considered whether a Panama corporation was subject to general personal jurisdiction in Florida. See Carmouche, 789 F.3d at 1206. The Panama corporation's only connections to Florida were a bank account, two Florida addresses, purchases of insurance from Florida companies, the filing of a financing statement with the Florida Secretary of State, membership in a non-profit trade organization in Florida, and "consent[ ] to jurisdiction of the Southern District of Florida for all lawsuits arising out of its agreements with" a cruise line operator. Id. at 1204. The court found that these connections were not "so 'substantial' as to make this one of those 'exceptional' cases in which a foreign corporation is 'at home' in a forum other than its place of incorporation or principal place of business." Id. (quoting Daimler, 134 S.Ct. at 761 n.19 ). Accordingly, the Eleventh Circuit affirmed the district court's dismissal of the plaintiff's complaint for lack of personal jurisdiction. Id. at 1206.
The Complaint here sets forth fewer connections between Honda and Florida than those alleged between the Panamanian defendant and Florida in Carmouche. Indeed, the only jurisdictionally relevant allegations about Honda are that it is a California corporation with its principal place of business in California. (DE 50 ¶ 84). The Complaint also states, without substantiating facts, that all "Defendants ... conduct substantial business in this District." (DE 50 ¶ 27). Plaintiffs do not support these statements with facts sufficient to allow the Court's exercise of general personal jurisdiction over Honda.[5] Additionally, because the general jurisdiction provisions of Florida's long-arm statute are coextensive with the limits on personal jurisdiction imposed by the Fourteenth Amendment, the Court's exercise of general personal jurisdiction on the facts alleged could violate Honda's due process rights as well. See Fraser v. Smith, 594 F.3d 842, 846 (11th Cir. 2010) ("The reach of [ Florida Statute 48.193(2) ] extends to the limits on personal jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment.") (citation omitted).
Plaintiffs' Complaint is similarly deficient as to specific personal jurisdiction. Plaintiffs contend that Honda has engaged in conduct that subjects it to specific personal jurisdiction pursuant to three provisions of Florida's long-arm statute:
1. Operating, conducting, engaging in, or carrying on a business or business venture in [Florida] or having an office or agency in this state.
Fla. Stat. § 48.193(1)(a)(1).
2. Committing a tortious act within [Florida]
Fla. Stat. § 48.193(1)(a)(2).
6. Causing injury to persons or property within [Florida] arising out of an *1216 act or omission by the defendant outside [Florida], if, at or about at the time of the injury, either ... [t]he defendant was engaged in solicitation or service activities within this state; or ... [p]roducts, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.
Fla. Stat. § 48.193(1)(a)(6).
Plaintiffs do not sufficiently allege, as Section 49.193(1)(a)(1) requires, that Honda operated, conducted, engaged in, or carried on business within Florida or had an office or agency within Florida[6] Nor do they allege, as Section 48.193(1)(a)(6) requires,[7] that they suffered any personal injury or physical property damage. See Courboin v. Scott, 596 Fed.Appx. 729, 734 (11th Cir. 2014).
In light of the dearth of factual allegations in support of specific personal jurisdiction over Honda, Plaintiffs rely on a "stream of commerce" theory. They point out that Honda "has delivered a defective product into Florida for placement in the stream of commerce" (DE 98 at 7) such that specific personal jurisdiction over the Florida Plaintiffs' claims inheres pursuant to Section 48.193(1)(a)(2). They also assert that "some of Plaintiffs' claims arise out of Defendants'... committing a tortious act in this state[.]" (DE 98 at 6). But these generalized statements-devoid of specificity as to Honda and in tension with specific allegations elsewhere in the Complaint-do not support an inference that Honda committed a tortious act in Florida as contemplated by Section 48.193(1)(a)(2). Indeed, the Complaint states only that Honda "conducts the sale, marketing, and operational activities for Honda cars, trucks, and sport utility vehicles automobile parts in the United States" (DE 50 ¶ 84); "manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio" (DE 50 ¶ 84); and that four Florida Plaintiffs purchased or leased Honda vehicles in Florida (DE 50 ¶¶ 35, 38, 62, 65). Notably, and contrary to Plaintiffs' suggestion in their briefing,[8] the Complaint does not allege that these purchases or leases were from a Honda-affiliated dealer in Florida. Thus, the Complaint is insufficient to support specific *1217 personal jurisdiction under a "stream of commerce" theory.
Plaintiffs' reliance on Bolton v. Bunny's Pride & Joy, I, Inc., 521 So.2d 327 (Fla. 4th DCA 1988), to support its "stream of commerce" theory, is misplaced. In that case, the court reversed and remanded the trial court's dismissal of claims against an out-of-state defendant for lack of personal jurisdiction because "delivery of a defective product into Florida for placement in the stream of commerce ... constitute[d] 'committing a tortious act within this state' as provided" in the predecessor to Section 48.193(1)(a)(2). However, in Bolton, there were particular allegations that the out-of-state defendant, "pursuant to a contractual relationship" with a co-defendant Florida corporation, "delivere[d] conversion vans to [the Florida co-defendant] in Florida for placement into the stream of commerce in Florida." Id. (emphasis added). In contrast, Plaintiffs offer only the unsupported inference that Honda delivered its vehicles into Florida for placement into the stream of commerce through a contract or otherwise and the allegation that Honda manufactures and markets its vehicles "in the United States." (DE 50 ¶ 84). As such, the Complaint's allegations do not support the Court's specific personal jurisdiction over Honda. Therefore, the Court dismisses Counts 1, 2, 4, 5, and 6[9] as alleged against Honda without prejudice, but will afford Plaintiffs another chance to allege sufficient facts in support of the Court's personal jurisdiction over Honda.
B. MBUSA's Motion to Dismiss
The Complaint alleges four causes of action against MBUSA: Count 1 for violations of the MMWA, Counts 2 and 5 for fraudulent concealment on behalf of a nationwide class and Florida sub-class, respectively, and Count 4 for violations of FDUTPA. MBUSA first argues that Plaintiffs lack Article III standing to pursue these claims and that their NHTSA-supervised recall of the defective ACUs renders Plaintiffs' claims prudentially moot. Next, MBUSA contends that Florida's economic loss rule bars the fraud claims against them. Finally, MBUSA asserts that Plaintiffs fail to state fraud claims for a variety of other reasons, including failure to allege supporting facts with the specificity required by Rule 9(b). The Court finds that although Plaintiffs have standing to pursue most of their claims against MBUSA, each of the Complaint's counts against MBUSA fail to sufficiently state a claim.
i. Standing and Prudential Mootness
MBUSA's motion first seeks dismissal pursuant to Rule 12(b)(1), contending that the three Plaintiffs who purchased or leased Mercedes Benz vehicles-Leon, Paz, and Morrow-lack standing for four reasons. First, it contends that Mercedes Benz's voluntarily initiated program to recall certain vehicles and replace certain parts free of charge moots Leon and Paz's claims. Second, it argues that Morrow lacks standing because she does not own a vehicle that was subject to this recall and repair program. Third, it asserts that Leon, Paz, and Morrow-all of whom purchased Mercedes Benz C-Class vehicles-cannot bring claims on behalf of owners of Mercedes Benz vehicle models different from those that they did purchase. Fourth, it argues that Leon, Paz, and Morrow-all *1218 Florida plaintiffs who purchased their vehicles in Florida-cannot bring claims on behalf of a nationwide class. Of these four claims, the Court finds that only the third argument is meritorious, and, therefore, that Leon, Paz, and Morrow have standing to bring all claims except those they purport to bring on behalf of purchasers of Mercedes Benz GLK-class vehicles.
It is axiomatic that "Article III of the Constitution of the United States limits the subject matter jurisdiction of federal courts to 'Cases' and 'Controversies.' " In re Checking Account Overdraft Litig., 780 F.3d 1031, 1037 (11th Cir. 2015) (citing SEC v. Quest Energy Mgmt. Grp., 768 F.3d 1106, 1108 (11th Cir. 2014) ); see also U.S. Const. art. Ill, § 2. "The powerful limitations that Article III places on the federal judiciary-including the mootness doctrine-relate to a centuries-old idea about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government." Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328 (11th Cir. 2004) (quotation marks and citation omitted). "The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim." Parker v. D.C., 478 F.3d 370, 377 (D.C. Cir. 2007) (citing Warth v. Seldin, 422 U.S. 490, 501-02, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ), aff'd sub nom. D.C. v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Nonetheless, even if the case meets Article Ill's requirements, courts may "exercise ... discretion and decline to grant declaratory relief" pursuant to the doctrine of prudential mootness "in the context of a controversy that has become so attenuated that considerations of prudence and comity counsel the court to stay its hand, and to withhold relief it has the power to grant." Ingaseosas Int'l Co. v. Aconcagua Investing Ltd., 479 Fed.Appx. 955, 962 (11th Cir. 2012) (citation omitted). In the prudential mootness inquiry, "[t]he critical question becomes whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." Id. (quotation marks and citation omitted).
First, MBUSA raises a standing argument related to its voluntary recall and repair program. MBUSA relies on the declaration of its Product Analysis Engineer Timothy Lowery (DE 80) to assert that Leon's vehicle, through this program, has already received repairs at no cost to her, and that Paz was notified of his eligibility for a recall-related repair but has not sought a repair to date. MBUSA contends that their program thus deprives Leon and Paz of Article III standing to bring Counts 1, 2, 4, and 5 or, in the alternative, warrants dismissal of these claims as prudentially moot.
In support, MBUSA cites Hadley v. Chrysler Group LLC, 624 Fed.Appx. 374 (6th Cir. 2015), in which the Sixth Circuit affirmed a district court's dismissal of the plaintiffs' automobile-defect-related claims for lack of Article III standing. Hadley, 624 Fed.Appx. at 375. In January 2013, the defendant in Hadley, Chrysler Group LLC ("New Chrysler"), sent a notice to owners of 2002 to 2004 model Jeep Grand Cherokees stating that it would repair-free of charge-a defect that could cause inadvertent airbag deployments. Id. at 375. The plaintiffs, who owned a 2003 Jeep Grand Cherokee, were initially unable to get a repair from their New Chrysler dealership because of a delay in obtaining the necessary parts, so they sued seeking damages for breach of contract and the covenant of good faith and fair dealing; a declaratory judgment that their vehicle had a safety defect that New Chrysler was responsible for repairing "as quickly as possible" and free of charge; an injunction requiring *1219 New Chrysler to repair the defect free of charge and to provide a substitute vehicle until repairs were made; and damages from the manufacturer of the allegedly defective component. Id. at 376. Soon after the plaintiffs sued, New Chrysler sent them another notice regarding the availability of the necessary parts and, while New Chrysler's motion to dismiss was pending, they received a repair, which the district court found deprived them of Article III standing. Id.
The Sixth Circuit affirmed the district court's holding that the Hadley plaintiffs lacked standing because New Chrysler-an entity incorporated in relation to the bankruptcy of another entity, Chrysler, LLC ("Old Chrysler")-did not manufacture the plaintiffs' vehicle. Because Old Chrysler had manufactured the plaintiffs' vehicle, the plaintiffs could not bring diminished value claims against New Chrysler. Id. at 378. Accordingly, the Sixth Circuit rejected the plaintiffs' argument that "when there's a major safety defect, diminished value is commonsense" because the plaintiffs were not "suing the manufacturer of their vehicles based on allegations that the vehicles were defective from the moment of purchase. " Id. at 378 (emphasis in original) (citing Cole v. Gen. Motors Corp., 484 F.3d 717, 722-23 (5th Cir. 2007) ). The Sixth Circuit also found that the plaintiffs' claims for declaratory judgment and injunctive relief were moot because the plaintiffs sought no equitable relief beyond the scope of the repairs that New Chrysler had already performed. Id. at 379-80.
Here, the Complaint alleges that Leon and Paz purchased vehicles manufactured by Mercedes Benz and that those vehicles contained the defect from the moment they were obtained. (DE 50 ¶¶ 29-34, 80-82). Accordingly, Leon and Paz seek to recoup the "lost benefit of the bargain [and] the diminished value of their [d]efective [v]ehicles" (DE 97 at 7) from Mercedes Benz-the same company that manufactured their vehicles. Moreover, the scope of the relief requested here-which includes "awarding Plaintiffs ... damages for the return of the purchase prices of the Defective Vehicles"; "establishing a Defendant-funded program ... under which out-of-pocket expenses and damages claims associated with the [defective ACUs] ... can be made and paid"; and "disgorg[ing] ... all or part of the ill-gotten profits received from the sale or lease of vehicles containing the defective ACUs-exceeds both the scope of the relief requested in Hadley and the scope of the already-performed recall and repairs here. (DE 50 at 68-70). Accordingly, the analysis in Hadley does not support dismissal of Leon's or Paz's claims.
MBUSA also relies on Winzler v. Toyota Motor Sales USA, Inc., 681 F.3d 1208 (10th Cir. 2012), and Cheng v. BMW of N. Am., LLC, No. CV 12-09262 GAF(SHx), 2013 WL 3940815 (C.D. Cal. July 26, 2013) to argue that the Court should dismiss Leon and Paz's claims pursuant to the prudential mootness doctrine. Notably, the plaintiffs in Winzler and Cheng requested only declaratory and injunctive relief through a court-ordered recall and did not seek damages. Thus, as the court observed in Philips v. Ford Motor Company, No. 14-CV-02989-LHK, 2016 WL 693283 (N.D. Cal. Feb. 22, 2016), Winzler and Cheng are unpersuasive where plaintiffs seek "recovery for losses in market value." Philips, 2016 WL 693283, at *8-9 ; see also In re: Gen. Motors LLC Ignition Switch Litig., No. 14-MC-2543 (JMF), 2016 WL 3920353, at *40 (S.D.N.Y. July 15, 2016) ("Because the recalls, even those sufficient to remedy the defects, do not compensate Plaintiffs fully for the damages sought here, the Court declines to exercise its discretion to dismiss the remaining claims as prudentially moot."). Because MBUSA's initiation *1220 of a recall does not render all of Plaintiffs' claims moot as did the recalls in Winzler and Cheng, Plaintiffs may still be able to recover economic losses should their claims succeed.[10]
Second, MBUSA attacks Plaintiff Morrow's standing to bring any claims against MBUSA because her vehicle was not subject to MBUSA's voluntary 2015 recall and reimbursement program. This argument also relies on Lowery's declaration, which states that Morrow's vehicle was "produced on April 24, 2009" and contains a "control unit module that was manufactured according to a different process than those at issue" in the vehicles that Mercedes Benz recalled in 2015. (DE 80 ¶ 9). Although Lowery's declaration brings into question the Complaint's allegation that Morrow's vehicle "is subject to the recall" (DE 50 ¶ 69), it has no impact on the Court's standing inquiry. The Complaint expressly states that some vehicles which contain the defective ACU have not yet been subject to recall; indeed, the Complaint states the "manufacturing defect in the [d]efective [ACUs] dates back to at least 2006 and continued through the end of 2010 " (DE 50 ¶ 6) (emphasis added) and that any "countermeasure[s]" taken to resolve the defect from March 2008 onward "failed, if they were implemented *1221 at all" (DE 50 ¶ 8). Consequently, at this stage in the litigation, the Court cannot reasonably infer from Lowery's declaration that Morrow's vehicle does not contain the defective ACU and that Morrow lacks standing to bring claims against MBUSA.
Third, MBUSA raises the meritorious argument that Leon, Paz, and Morrow-all of whom purchased Mercedes Benz C Class model vehicles in Florida-have no standing to bring Counts 1, 2, 4, and 5 on behalf of owners of Mercedes Benz GLK Class model vehicles. In support, MBUSA cites several cases from this District which hold that a class representative in a consumer class action may not bring claims on behalf of purchasers of a product that the representative did not herself purchase. See, e.g., Bohlke v. Shearer's Foods, LLC, No. 9:14-CV-80727, 2015 WL 249418, at *4 (S.D. Fla. Jan. 20, 2015) ; Garcia v. Kashi Co., 43 F.Supp.3d 1359, 1391-94 (S.D. Fla. 2014) ; Toback v. GNC Holdings, Inc., No. 13-80526-CIV, 2013 WL 5206103, at *4-5 (S.D. Fla. Sept. 13, 2013). These decisions cite the Eleventh Circuit's determination in Prado-Steiman v. Bush, 221 F.3d 1266 (11th Cir. 2000) that in a class action, at least one named plaintiff must establish Article III standing with respect to each class sub-claim. Prado-Steiman, 221 F.3d at 1279-80. "In other words, Article III standing of a named plaintiff must be established on a claim-by-claim basis within the Eleventh Circuit, and deferring the standing determination to the class certification stage will yield no different result." Toback, 2013 WL 5206103, at *4.
Plaintiffs respond by citing to their allegation that the same defective ACU was installed in 2008-2009 Mercedes Benz C Class and 2010 Mercedes Benz GLK Class vehicles, meaning that Leon, Paz, and Morrow's C-Class vehicles contained the same defect as GLK Class vehicles. (DE 50 ¶¶ 1, 4). Next, they correctly point out that some courts in other districts have allowed class claims on behalf of purchasers of products that the named plaintiff did not purchase, so long as those products are sufficiently similar to a product that the named plaintiff did purchase. See, e.g., Glenn v. Hyundai Motor Am., No. SACV152052DOCKESX, 2016 WL 3621280, at *14-16 (C.D. Cal. June 24, 2016) ; Porter v. Chrysler Grp. LLC, No. 6:13-CV-555-ORL-37, 2013 WL 6839872, at *2 (M.D. Fla. Dec. 27, 2013). However, as courts in this District have made clear, this "sufficient similarity" argument has not been adopted in the Eleventh Circuit. See, e.g., Bohlke, 2015 WL 249418, at *4 ("[I]n the Eleventh Circuit, a named plaintiff in a consumer class action cannot raise claims relating to products which she herself did not purchase."); Garcia v. Kashi Co., 43 F.Supp.3d 1359, 1393 (S.D. Fla. 2014) ("[A] named plaintiff in a consumer class action lacks standing to challenge a non-purchased product because there is no injury-in-fact as to that product, even if he purchased a substantially similar product."); Toback v. GNC Holdings, Inc., No. 13-80526-CIV, 2013 WL 5206103, at *5 (S.D. Fla. Sept. 13, 2013) ("Plaintiff ... cannot establish his Article III standing with respect to any product other than the Vitapak ... and cannot raise claims relating to those other products which he did not purchase."). Consequently, Plaintiffs cannot bring claims on behalf of the owners of a class of vehicles that none of the Plaintiffs purchased.
Fourth, MBUSA argues that the Florida Plaintiffs Leon, Paz, and Morrow cannot bring Counts 1 and 2 on behalf of a nationwide class. Plaintiffs respond that "the requirements for the [implied warranty] and fraudulent concealment claims asserted against MBUSA are substantively uniform across all states" (DE 97 at 12) such that the Court should permit these claims to *1222 survive MBUSA's motion to dismiss. Without making any determination regarding the uniformity of state laws related to Plaintiffs fraudulent concealment or implied warranty claims, the Court agrees that, at this stage of the litigation, choice-of-law arguments are insufficient to warrant dismissal on standing grounds. See Ortiz v. Fibreboard Corp., 527 U.S. 815, 831, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999) (holding that Rule 23 certification should be treated first where it is "logically antecedent" to Article III concerns); In re: Takata Airbag Prod. Liab. Litig., No. 14-24009-CV, 2015 WL 9987659, at *3 (S.D. Fla. Dec. 2, 2015) (declining to dismiss implied warranty claims "on premature choice-of-law issues"). The question of whether the uniformity of state warranty laws supports class certification is reserved for the class certification stage, where "[t]he burden of showing uniformity or the existence of only a small number of applicable standards (that is, 'groupability') among the laws of the fifty states rests squarely with the plaintiffs." See Klay v. Humana, Inc., 382 F.3d 1241, 1262 (11th Cir. 2004), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).
In sum, Plaintiffs have Article III standing to bring their claims against MBUSA, with the exception of those claims advanced on behalf of owners of vehicle models they do not own. Thus, the Court dismisses Plaintiffs' claims against MBUSA, as they pertain to Mercedes Benz GLK Class vehicles, for lack of standing.
ii. Failure to state a claim
Proceeding to the Rule 12(b)(6) arguments in MBUSA's motion to dismiss, the Court finds that Plaintiffs' allegations are insufficient to support their implied warranty, fraudulent concealment, and FDUTPA claims. Specifically, the implied warranty claim fails for lack of contractual privity between Plaintiffs and MBUSA; the fraudulent concealment claims are barred by Florida's economic loss rule; and the FDUTPA claim is not pled with sufficient particularity. Consequently, the Court dismisses pursuant to Rule 12(b)(6) what remains of Plaintiffs' claims against MBUSA.
1. Count 1: Implied Warranty
MBUSA first attacks the claim that it failed to comply with the terms of an "implied warranty of merchantability" (DE 50 ¶ 124) in violation of the MMWA, 15 U.S.C. § 2301 et seq. At the outset, the Court notes that the Parties appear in agreement that the MMWA claim against MBUSA-brought solely by Florida Plaintiffs and based on transactions that occurred in Florida-derives from a Florida law claim for breach of implied warranty.[11] See In re Takata Airbag Prod. Liab. Litig., 193 F.Supp.3d 1324, 1346 (S.D. Fla. 2016) ("For [MMWA] claims, courts 'must look to the relevant state law to determine the meaning and creation of any implied warranty.' "). Accordingly, the Court evaluates Plaintiffs' claim pursuant to Florida law, which requires privity of contract for an implied warranty to exist. See Yvon v. Baja Marine Corp., 495 F.Supp.2d 1179, 1183-84 (N.D. Fla. 2007) (quoting *1223 Mesa v. BMW of N. Am., LLC, 904 So.2d 450, 458 (Fla. 3d DCA 2005) ). "The privity requirement applies to lease as well as sales transactions." Speier-Roche v. Volkswagen Grp. of Am. Inc., No. 14-20107-CIV, 2014 WL 1745050, at *7 (S.D. Fla. Apr. 30, 2014) (citing O'Connor v. Kawasaki Motors Corp., 699 F.Supp. 1538, 1543-44 (S.D.Fla.1988) ).
Here, Plaintiffs state that they "have had sufficient direct dealings with Defendants or their agents (dealerships) to establish privity of contract." (DE 50 ¶ 29). This legal conclusion, however, is unsupported by sufficient factual allegations. Indeed, Plaintiffs Leon, Paz, and Morrow allege only that they purchased their Mercedes Benz vehicles in Florida without naming the person or entity from whom they obtained the vehicles. (DE 50 ¶¶ 29, 32, 68). Therefore, Plaintiffs cannot establish privity of contract with MBUSA on the facts alleged, warranting dismissal of their implied warranty claim. See Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003) ("Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.")
The decision in Takata is particularly instructive. In that multidistrict litigation, plaintiff Mickey Vukadinovic brought an MMWA claim against Mazda Motor of America, Inc. alleging a Florida breach of implied warranty in relation to an airbag defect contained in his vehicle. In dismissing Vukadinovic's claim, the court explained:
Mazda argues ... that Vukadinovic lacked privity with Mazda, and thus, cannot maintain a claim for breach of implied warranty. The Court agrees. Mazda is an automotive distributor, not a dealer. Vukadinovic could not have purchased his vehicle from Mazda. Thus, Vukadinovic lacks privity with Mazda and the implied warranty claim must fail.
Takata, 193 F.Supp.3d at 1346 (citing Mesa, 904 So.2d at 458 ("Under Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity.") ); David v. Am. Suzuki Motor Corp., 629 F.Supp.2d 1309, 1321 (S.D. Fla. 2009) ("Florida law requires privity of contract to sustain a breach of implied warranty claim.") ).[12] As in Takata, MBUSA is not a dealer (DE 50 ¶ 81) and Plaintiffs have failed to allege sufficient grounds for privity of contract with MBUSA, barring their MMWA claim pursuant to Florida law.
Plaintiffs respond in two ways. First, they argue that Florida law does not require privity of contract to establish an implied warranty, citing Manheim v. Ford Motor Co., 201 So.2d 440 (Fla. 1967). In Manheim, the Florida Supreme Court reversed summary judgment for an automobile manufacturer, holding that "the absence of privity between the manufacturer and a purchaser" of a defective 1964 Lincoln Continental four-door convertible did not "preclude recovery on the basis of implied warranty of a product due to its defects and lack of fitness and suitability." Id. at 442. However, the Florida Supreme Court later abrogated this decision by *1224 holding that it "abolished the no-privity, breach of implied warranty cause of action for personal injury upon its adoption of the doctrine of strict liability in tort." Kramer v. Piper Aircraft Corp., 520 So.2d 37, 39 (Fla. 1988) (citing West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla. 1976) ). Thus, subsequent implied warranty cases have required privity and Florida appellate courts have affirmed dismissals of claims that do not sufficiently allege privity. See, e.g., Cerasani v. Am. Honda Motor Co., 916 So.2d 843, 847 (Fla. 2d DCA 2005) (affirming dismissal of breach of implied warranty claim where plaintiff failed to the allege privity of contract with automobile manufacturer defendant); Rentas v. DaimlerChrysler Corp., 936 So.2d 747, 751 (Fla. 4th DCA 2006) (same). Thus, privity is required to state a breach of implied warranty claim under Florida law and Plaintiffs have not alleged privity here.
Second, Plaintiffs argue that MBUSA may not raise the privity defense where Plaintiffs are the "intended third-party beneficiaries of MBUSA's warranty." (DE 97 at 14). This argument relies primarily on Sanchez-Knutson, in which another court of this District held that although Kramer overruled Manheim, a "[p]laintiff can pursue a claim of breach of implied warranty through third-party beneficiary status." Sanchez-Knutson, 52 F.Supp.3d at 1333-34. However, the complaint in Sanchez-Knutson featured specific allegations regarding how the plaintiff obtained her allegedly defective vehicle, including that she purchased it from an authorized dealership over which the defendant automobile manufacturer appeared to exercise control. Sanchez-Knutson v. Ford Motor. Co., No. 14-cv-61344, DE 1 ¶¶ 12, 34-35 (S.D. Fla. June 9, 2014). Here, Plaintiffs offer no facts about the persons or entities from whom they obtained their Mercedes Benz vehicles, let alone that MBUSA exercised any degree of control over them. A claim for a breach of implied warranty under a third-party beneficiary theory, if it exists, does not arise from the conclusory assertion that Plaintiffs were "the intended third-party beneficiaries of contracts between Defendants and its dealers." (DE 50 ¶ 129). Therefore, Plaintiffs' MMWA claim against MBUSA is dismissed.
2. Counts 2 and 5: Fraudulent Concealment
MBUSA next contends that Counts 2 and 5, which the Florida Plaintiffs Leon, Paz, and Morrow bring on behalf of a nationwide class and a Florida sub-class, respectively, fail pursuant to Florida's economic loss rule.[13] The Court agrees. Florida's economic loss rule applies in products liability cases to preclude "recovery of economic damages in tort where there is no property damage or personal injury." Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., 110 So.3d 399, 404 (Fla. 2013). In Tiara, the Florida Supreme Court explained that "[t]he rule has its roots in the products liability arena, and was primarily intended to limit actions in the products liability context." Id. at 401. Specifically, the court explained the economic loss rule is "the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." Id. (internal quotation marks omitted). Id. Counts 2 and 5, in which Plaintiffs allege MBUSA's fraudulent concealment of defects and request *1225 diminished value damages despite alleging no specific property damage or personal injury, are precisely the type of claim barred by this rule.
Plaintiffs respond by characterizing their fraudulent concealment claims as fraudulent inducement claims based on their allegations that Defendants including MBUSA "concealed and/or suppressed material facts concerning the safety" of Plaintiffs' vehicles (DE 50 ¶ 140) and that this "concealment was material" to Plaintiffs' purchasing decisions (DE 50 ¶ 195). Relying on this characterization, Plaintiffs argue that the Florida Supreme Court's decision in Tiara acknowledged an exception to Florida's economic loss rule for claims of "fraudulent inducement, and negligent misrepresentation." See Tiara, 110 So.3d at 406. They cite In re MyFord Touch Consumer Litigation, 46 F.Supp.3d 936, 965-66 (N.D. Cal. 2014), in which a California court applied Tiara to find that Florida's economic loss rule did not bar a claim based on "a statutory duty, a duty not to fraudulently induce another to enter a contract, and a duty to disclose." Regardless of how Plaintiffs characterize Counts 2 and 5, which are explicitly termed "fraudulent concealment" actions, MyFord Touch is inapposite because the Florida Supreme Court did not intend any "fraudulent inducement" exception to the economic loss rule in the products liability context:
The question before the Court, then, is whether Florida's Supreme Court, by its dicta, intended to abridge the economic loss rule in the products liability setting to allow fraudulent inducement and negligent misrepresentation claims (and by implication fraudulent concealment claims), even where the action for fraud depends upon precisely the same allegations as a warranty claim-i.e., a claim the product failed to work as promised. The Court agrees with other courts in this Circuit that have concluded that Florida's Supreme Court did not intend to allow such products liability claims to survive.
Takata, 193 F.Supp.3d at 1338-39 (citing Aprigliano v. Am. Honda Motor Co., 979 F.Supp.2d 1331 at 1337-39 (S.D. Fla. 2013) ); see also Burns v. Winnebago Indus., Inc., No. 8:13-cv-1427-T-24, 2013 WL 4437246, at *4 (M.D. Fla. Aug. 16, 2013) ; In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig., No. 130md-2495, 2015 WL 3796456, at *3 (N.D. Ga. June 18, 2015) ). Consequently, the Court dismisses Counts 2 and 5 as alleged against MBUSA pursuant to Florida's economic loss rule.
3. Count 4: FDUTPA
Finally, MBUSA attacks the viability of Plaintiffs' FDUTPA claim, Count 4, by arguing that the Complaint does not set forth allegations with the specificity required by Rule 9(b). Plaintiffs respond by arguing that Rule 9(b) does not apply to FDUTPA claims.
It is true that several courts in this District have found that "the requirements of Rule 9(b) do not apply to claims under the FDUTPA." Toback, 2013 WL 5206103, at *2 (citing Galstaldi v. Sunvest Cmties.USA, LLC, 637 F.Supp.2d 1045, 1058 (S.D. Fla. 2009) ); see also Sanchez-Knutson, 52 F.Supp.3d at 1239 ; U.S. Bank Nat. Ass'n v. Capparelli, No. 13-80323-CIV, 2014 WL 2807648, at *5 (S.D. Fla. June 20, 2014) ; Costa v. Kerzner International Resorts, Inc., No. 11-60663-CV-COHN, 2011 WL 2519244, at *2 (S.D. Fla. June 23, 2011). In light of these decisions, the Court understands that Rule 9(b) might not apply to FDUTPA claims premised solely or primarily on unfair trade practices. See SIG, Inc. v. AT & T Digital Life, Inc., 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013) ("FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud, such as the FTC regulatory violations alleged here, and need not be pled *1226 with particularity."); In re Brican Am. LLC Equipment Lease Litig., No. 10-md-02183-PAS, 2014 WL 250246, at *10 (S.D. Fla. Jan. 22, 2014) ("A FDUTPA claim based on deceptive or unfair practices that do not involve fraud is exempt from the particularity requirements of Rule 9(b).").
The Court is not persuaded, however, that all FDUTPA claims-even those clearly sounding in fraud like the claims here-are exempt from Rule 9(b) scrutiny. Rule 9(b) serves the important purposes of placing defendants accused of fraud on notice about the "precise misconduct with which they are charged" and "protecting defendants against spurious charges of immoral and fraudulent behavior." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001). Accordingly, other courts have applied Rule 9(b) to FDUTPA claims that raise allegations of fraud. For example in Perret v. Wyndham Vacation Resorts, Inc., the court applied Rule 9(b) to Plaintiff's FDUTPA claim because the Rule "does not state that it only applies to claims for fraud; it says it applied to allegations of fraud. While not all claims under FDUTPA will be based on fraud, Plaintiffs' claim is. Consequently, Plaintiffs' FDUTPA claim must be plead with particularity." Perret, 846 F.Supp.2d 1327, 1333 (S.D. Fla. 2012) ; see also Begualg Inv. Management Inc. v. Four Seasons Hotel Ltd., No. 10-22153-CIV, 2011 WL 4434891, at *5 (S.D. Fla. Sep. 23, 2011) ("Here, the averments in the complaint describe fraudulent conduct and thus, Rule 9(b) applies."); Llado-Carreno v. Guidant Corp., No. 09-20971-CIV, 2011 WL 705403, *5 (S.D. Fla. 2011) (applying Rule 9(b) to FDUTPA claim based on a fraudulent inducement theory). Given that Plaintiffs' FDUTPA claim sounds in fraud, the Court applies Rule 9(b)'s requirements. See id. ("[The plaintiff]'s general allegation that '[the defendant]'s actions are deceptive and in clear violation of FDUTPA'... is not supported by any specific facts, and as a consequence, [the plaintiff] does not satisfy the heightened pleading requirement required by Federal Rule of Civil Procedure 9(b).")
However, even assuming that Rule 9(b) standards are not applicable, Plaintiffs' allegations are insufficient to state a claim. This is because Plaintiffs make no particularized allegations about what MBUSA did to violate FDUTPA; instead, they rely on general allegations against all "Defendants" or against "Mercedes Benz"-which includes both MBUSA and Daimler AG.[14] These allegations, which do not distinguish the conduct of Defendants, are insufficient to meet the requirements of Rule 8 of the Federal Rules of Civil Procedure, let alone Rule 9(b). Lane v. Capital Acquisitions & Mgmt. Co., No. 04-60602 CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, Lane's Complaint fails to satisfy the minimum standard of Rule 8."). For all of these *1227 reasons, Plaintiffs' FDUTPA claim is dismissed as alleged against MBUSA.
iii. Conclusion
The three Florida Plaintiffs who own Mercedes Benz vehicles-with the exception of those claims advanced on behalf of owners of vehicle models they do not own-have Article III standing to bring their claims against MBUSA. Moreover, these claims are not prudentially moot. However, Florida's economic loss rule bars Plaintiffs' fraudulent concealment claims against MBUSA and the Complaint's failure to plead with the requisite specificity bars Plaintiffs' FDUTPA claim against MBUSA. Additionally, the three Florida Plaintiffs cannot bring implied warranty claims against MBUSA because the Complaint does not sufficiently allege privity between the Plaintiffs and MBUSA. For the foregoing reasons, the Court dismisses Counts 1, 2, 4, and 5 as alleged against MBUSA.
C. Atmel's and Continental's Motions to Dismiss
The Complaint sets forth thirteen causes of action against Atmel and all except the three California law claims-Counts 10, 11, and 12-against Continental. As the Court explains below, none of these claims survive the Airbag Manufacturer Defendants' motions to dismiss.
"[J]urisdictional questions generally should be decided before reaching the merits." See Courboin, 596 Fed.Appx. at 735 (citing Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 940 (11th Cir. 1997) ). Thus, the Court first addresses the Airbag Manufacturer Defendants' shared personal jurisdiction arguments and finds that although it lacks personal jurisdiction over the Airbag Manufacturer Defendants pursuant to the traditional two-part test, it may still exercise personal jurisdiction to assess Plaintiffs' RICO claim. The Court finds, however, that the RICO count fails to state a claim. As a result, the Court cannot exercise pendent personal jurisdiction over any of the remaining state law claims against the Airbag Manufacturer Defendants and the Court dismisses all claims against these Defendants.
i. Personal Jurisdiction
1. Traditional two-part analysis
To exercise personal jurisdiction pursuant to the traditional two-part analysis, the Court must determine that the defendant's activities satisfy both Florida's long-arm statute and that the exercise of jurisdiction comports with the due process requirements of the Fourteenth Amendment. See Mosseri, 736 F.3d at 1350-51. The Court finds no basis for jurisdiction under the Florida long-arm statute for the Airbag Manufacturer Defendants in this case, precluding personal jurisdiction within the traditional framework.
Plaintiffs argue that the Airbag Manufacturer Defendants have engaged in activities that subject them to specific personal jurisdiction pursuant to three provisions of Florida's long-arm statute:
1. Operating, conducting, engaging in, or carrying on a business or business venture in [Florida] or having an office or agency in this state.
Fla. Stat. § 48.193(1)(a)(1).
2. Committing a tortious act within [Florida]
Fla. Stat. § 48.193(1)(a)(2).
6. Causing injury to persons or property within [Florida] arising out of an act or omission by the defendant outside [Florida], if, at or about at the time of the injury, either ... [t]he defendant was engaged in solicitation or service activities within this state; or ... [p]roducts, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within *1228 this state in the ordinary course of commerce, trade, or use.
Fla. Stat. § 48.193(1)(a)(6).
As discussed above in relation to Honda's motion, the Complaint does not provide enough detail to support personal jurisdiction under either Section 48.193(1)(a)(1) or 48.193(1)(a)(6). There are no allegations in the Complaint that Atmel or Continental operated, conducted, engaged in, or carried on business in Florida or had an office or agency in Florida as Section 48.193(1)(a)(1) requires. Likewise, the Complaint does not claim that Plaintiffs suffered any personal injury or physical property damage as Section 48.193(1)(a)(6) requires. See Courboin, 596 Fed.Appx. at 734.
Plaintiffs again must rely on a "stream of commerce" theory to support personal jurisdiction. They point out that Atmel "distribute[d] ... [ASICs] for airbags ... in the United States" (DE 50 ¶ 78), that Continental "distribute[d] ... [ACUs], in the United States" (DE 50 ¶ 77), and that Continental ACUs featuring Atmel ASICs made their way into the vehicles of eight Florida Plaintiffs who purchased or leased vehicles in Florida. They also point out that Atmel advertised the ASICs on the internet through an October 16, 2006 press release (DE 50 ¶ 176) and that Continental advertised its ACUs on the internet through press releases dated September 10, 2007 and September 2, 2009. (DE 50 ¶ 177). Plaintiffs claim these allegations establish that the Airbag Manufacturer Defendants committed tortious acts within Florida such that the Court may exercise specific[15] personal jurisdiction in comportment with Section 48.193(1)(a)(2). (DE 99 at 12-14; DE 100 at 11-13).
In support of their "stream of commerce" theory of personal jurisdiction, Plaintiffs again rely primarily on Bolton. But, as discussed in connection with Honda's motion, the out-of-state defendant in Bolton was an "installer of conversion packages in vans" and "pursuant to a contractual relationship" with a co-defendant Florida corporation "deliver[ed] conversion vans to [the Florida co-defendant] in Florida for placement into the stream of commerce in Florida." 521 So.2d at 327. (emphasis added). In contrast, there is no allegation here that Atmel or Continental ever delivered the ASIC or ACU, respectively, into Florida for placement into the stream of commerce in Florida. Instead, the Complaint alleges only that Airbag Manufacturer Defendants distributed their respective products "in the United States," (DE 50 ¶¶ 77, 78) which is insufficient to confer personal jurisdiction.
Plaintiffs also rely on Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534 (11th Cir. 1993), in which a Georgia plaintiff who suffered debilitating spinal injuries in a car accident sued the French state-owned automobile manufacturer Regie Nationale Des Usines Renault ("RNUR") and its American distribution affiliate pursuant to the Foreign Sovereign Immunities Act ("FSIA"), alleging design defects in the vehicle that she was driving when she was injured. Under the FSIA, "[t]he United States is the relevant forum for due process analysis" related to specific personal jurisdiction. Kozial v. Bombardier-Rotax GmbH, 129 Fed.Appx. 543, 547 n.5 (11th Cir. 2005) ; see also S.E.C. v. Carrillo, 115 F.3d 1540, 1544 (11th Cir. 1997) ("[T]he applicable forum for minimum contacts *1229 purposes is the United States in cases where ... the court's personal jurisdiction is invoked based on a federal statute authorizing nationwide or worldwide service of process."). The Eleventh Circuit found that RNUR had extensive contacts with United States: RNUR had "designed the Renault LeCar for the American market," "advertised its product in the United States," "established channels for providing regular advice to customers in the United States," and "created and controlled the distribution network that brought its products into the United States." Vermeulen, 985 F.2d at 1549-50. The Eleventh Circuit also noted various provisions in the contract between RNUR and its American distribution affiliate suggesting that RNUR intended to avail itself of the laws of the United States, and found that:
[t]hese contacts are sufficiently related to [the plaintiff's] cause of action to confer specific jurisdiction upon the United States.... RNUR intended its [its automobiles] to be brought to the United States and took numerous affirmative steps to bring that result about, and jurisdiction in this country would not violate RNUR's due process rights.
Id. at 1550 (emphasis in original).
This holding-that a French corporation facing FSIA claims had sufficiently entered the United States' "stream of commerce" for due process purposes-is inapplicable to the Court's Section 48.193(1)(a)(2) analysis, where the relevant forum is Florida and not the United States. See Kozial, 129 Fed.Appx. at 546-47, 547 n.5 (rejecting the plaintiff's reliance on Vermeulen and affirming the district court's dismissal of the plaintiff's complaint where the allegations were insufficient to support specific personal jurisdiction under Florida's long-arm statute). Indeed, Vermeulen never addressed Florida's long-arm statute and thus provided no guidance as to what qualifies as "committing a tortious act" within Florida.
Additionally, even assuming Vermeulen' s holding could be applicable, its facts are readily distinguishable. There, RNUR's advertising, customer service, and contractually-supported distribution network all showed that it had the intent and took the initiative to involve itself in the relevant forum, the United States. In contrast, the Plaintiffs allege superficial ties between the Airbag Manufacturer Defendants and the relevant forum, Florida. The Complaint alleges only that the Airbag Manufacturer Defendants distributed their products generally across the country and advertised their products over the internet.[16] There are no allegations that allow *1230 for the inference that either Atmel or Continental intended its products to be brought into Florida or took affirmative steps to do so, let alone that any such contacts gave rise to the injuries alleged. As Justice Breyer has noted, "something more than simply placing a product into the stream of commerce, even if defendant is aware that the stream may or will sweep the product into the forum State" is required to establish specific personal jurisdiction. J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 889, 131 S.Ct. 2780, 180 L.Ed.2d 765 (Breyer, J. concurring) (citations and quotations marks omitted). In this case, unlike in Vermeulen, "there is no 'something more,' such as special state-related design, advertising, advice, or marketing." Id. Nonetheless, Plaintiffs wish to hail Airbag Manufacturer Defendants to Florida court because eight Florida Plaintiffs either bought or leased vehicles which contained Atmel or Continental components from someone, somewhere in Florida.[17] Under these circumstances, the Court cannot exercise personal jurisdiction over any of Plaintiffs' claims against the Airbag Manufacturer Defendants in accordance with Florida's long-arm statute or the limits of the Due Process Clause of the Fourteenth Amendment.
2. RICO and Fifth Amendment Due Process
Although the Court is unable to exercise personal jurisdiction against the Airbag Manufacturer Defendants pursuant to the traditional personal jurisdiction analysis, it may still exercise personal jurisdiction over Plaintiffs' RICO based on RICO's nationwide service of process provision and the Fifth Amendment's Due Process Clause. See Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 948 (11th Cir. 1997) (reversing trial court's Rule 12(b)(2) dismissal of claims brought pursuant to federal RICO statute); Prou v. Giarla , 62 F.Supp.3d 1365, 1373 (S.D. Fla. 2014) (exercising personal jurisdiction over claims brought pursuant to the federal RICO statute). "When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." Panama, 119 F.3d at 942 (citing In re Chase & Sanborn Corp., 835 F.2d 1341, 1344 (11th Cir. 1988), rev'd on other grounds sub. nom. Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) ). Consistent with Plaintiffs' allegations as discussed in Part Ill.C.ii below, "insofar as an asserted federal claim is not wholly immaterial or insubstantial, a plaintiff is entitled to take advantage of the federal statute's nationwide service of process provision" to establish personal jurisdiction. Id. at 942.[18] Further, as was the *1231 case in Panama, "[b]ecause [Atmel and Continental] are domestic corporations doing business in this country" that face claims brought pursuant to the federal RICO statute, "the statutory basis for personal jurisdiction ... is satisfied." See id.
A discussion of "[t]he constitutional question is considerably more involved. It is well established that when, as here, a federal statute provides the basis for jurisdiction, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." Id. (citing Chase & Sanborn, 835 F.2d at 1344 ). In tracing the evolution of precedent on the limits that the Fifth Amendment Due Process Clause places on personal jurisdiction, the Panama Court concluded that "courts should balance the burdens imposed on the individual defendant against the federal interest involved in the litigation." Id. at 946 (citations omitted). However, "courts must engage in this balancing only if a defendant has established that his liberty interests actually have been infringed. Only when a defendant challenging jurisdiction has 'present[ed] a compelling case that ... would render jurisdiction unreasonable' should courts weigh the federal interests favoring the exercise of jurisdiction." Id. (quoting Burger King, 471 U.S. at 477, 105 S.Ct. 2174 ).
Under this Fifth Amendment framework, the Panama Court found that the district court should have exercised personal jurisdiction over two out-of-state corporate defendants who "may not have had significant contacts with Florida" but who "presented no evidence that their ability to defend this lawsuit will be compromised significantly if they are required to litigate in Miami." Id. at 948. Accordingly, the Court declined to "balance the federal interests at stake" and reversed the district court's Rule 12(b)(2) dismissal of the plaintiff's RICO claims against those defendants. Id. More recently, a district court in another RICO case applied Panama to exercise personal jurisdiction over a defendant who did not demonstrate how litigation in this District would be "so gravely difficult and inconvenient" as to raise Fifth Amendment concerns. Prou, 62 F.Supp.3d at 1372-73.
The facts of this case compel the same result as to Plaintiffs' RICO claim. Neither Atmel nor Continental have presented sufficient evidence to demonstrate Fifth Amendment concerns with having to litigate this suit in Miami. Accordingly, the Court exercises personal jurisdiction over Plaintiffs' RICO claim consistent with both RICO's nationwide service of process provision, 18 U.S.C. § 1965(d), and the limitations imposed by the Fifth Amendment's Due Process clause.
Having appropriately exercised personal jurisdiction over Count 3, the "pendent personal jurisdiction" doctrine comes into play and the Court may also "exercise[ ] personal jurisdiction over Defendants with respect to the state-law claims without engaging in the traditional personal jurisdiction analysis." See Koch v. Royal Wine Merchants, Ltd., 847 F.Supp.2d 1370, 1378 (S.D. Fla. 2012) (citing ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 628 (4th Cir. 1997) ). This doctrine has been adopted by other circuits. See ESAB Group, 126 F.3d at 628 ; Action Embroidery Corp. v. Atl. Embroidery, Inc., 368 F.3d 1174, 1180-81 (9th Cir. 2004) ; Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993) ("[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process and the federal and state claims 'derive from a *1232 common nucleus of operative fact' ... the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available.") (internal citation omitted), cert. denied, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994). Critically, however, Plaintiffs' RICO claim must survive a 12(b)(6) analysis if it is to serve as the basis for the Court's personal jurisdiction over Plaintiffs' remaining state law claims against Atmel and Continental. Thus, to reach the issue of pendent personal jurisdiction, the Court must first assess whether Plaintiffs' RICO cause of action withstands the Airbag Manufacturer Defendants' Rule 12(b)(6) motion.
ii. Failure to State a Claim
Count 3 of the Complaint alleges that the Airbag Manufacturer Defendants' actions violated RICO, 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." RICO expressly creates a civil cause of action for "[a]ny person injured in his business or property by reason of violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).
"Congress enacted RICO in 1970, prohibiting racketeering activity connected to interstate commerce." Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1348 (11th Cir. 2016). "Although initially enacted to fight organized crime, the Supreme Court has rejected a reading of RICO that applies only where the pattern of conduct is 'characteristic either of organized crime in the traditional sense, or of an organized-crime-type perpetrator.' " Id. (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 243, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) ). Indeed, "the RICO statute provides that its terms are to be liberally construed to effectuate its remedial purpose." Id. at 1349 (quoting Boyle v. United States, 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) ). This liberality, however, does not absolve civil RICO plaintiffs of their obligation to comply with the requirements of Iqbal and Twombly. Thus, to state a civil RICO claim, Plaintiffs must successfully allege four elements: that Airbag Manufacturer Defendants "(1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity." Id. at 1348.
As to the first element, although "lower-level participants under the direction of upper management may be found to satisfy the 'operation or management' test[,] ... [a] defendant must knowingly implement and make decisions in order to be liable under the 'operation or management' test." United States v. Browne, 505 F.3d 1229, 1277 (11th Cir. 2007) (quotation marks and citation omitted). In relation to the second element, an "enterprise must possess three qualities: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.' " Ray II, 836 F.3d at 1352 (quoting Boyle, 556 U.S. at 946, 129 S.Ct. 2237 ). For the third element, "[a] 'pattern' of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts." Williams v. Mohawk Indus., Inc., 465 F.3d 1277, 1282-83 (11th Cir. 2006), abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc., 744 F.3d 702, 714 (11th Cir. 2014). And finally, with regard to the fourth element, RICO "defines 'racketeering activity' as the enumerated crimes listed in 18 U.S.C. [§] 1961(1), including mail fraud and wire fraud as alleged in this case."
*1233 McCulloch v. PNC Bank Inc., 298 F.3d 1217, 1225 (11th Cir. 2002) (citing 18 U.S.C. § 1961(1)(B) ). "[M]ail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." Pelletier v. Zweifel , 921 F.2d 1465, 1498 (11th Cir. 1991), abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008).[19]
Moreover, because civil RICO actions sound in fraud, Plaintiffs must offer heightened specificity in the facts supporting their claim.[20] Specifically, Plaintiffs must allege: "(1) the precise statements, documents, or misrepresentations made;
*1234 (2) the time and place of and person responsible for the statement; (3) the content and manner in which the statements misled the Plaintiffs; and (4) what the Defendants gained by the alleged fraud." Ambrosia Coal, 482 F.3d at 1316-17 (citing Brooks, 116 F.3d at 1380-81 ).
In Ambrosia Coal and Brooks, the Eleventh Circuit affirmed two the decisions of two district courts that dismissed RICO claims for failure to satisfy Rule 9(b). In Ambrosia Coal, the Eleventh Circuit based its affirmance on the plaintiff's "fail[ure] to plead its civil RICO claims against each defendant with the required level of specificity." Id. at 1317. Examples of dispositive deficiencies with the plaintiff's allegations included failure to "discuss the nature of each defendant's participation in the scheme," failure to "discuss each alleged statement, document, or misrepresentation made with the proper level of precision," and reliance on "material misrepresentations without specifying the content or manner in which the statements misled" the plaintiffs. Id. at 1317 n.12.
Similarly, in Brooks, the Eleventh Circuit affirmed the district court's dismissal of the plaintiffs civil RICO claims pursuant to Rule 9(b) where the plaintiff "lumped together all of the Defendants in their allegations of fraud" and the complaint was "devoid of specific allegations with respect to the separate Defendants." Brooks, 116 F.3d at 1381. In so holding, the Eleventh Circuit explained that plaintiffs had contravened "[p]erhaps the most basic consideration underlying Rule 9(b)"-provision of fair notice to the defendants of the claims against them. Id. (alteration in original). The court also noted that the plaintiff had "fail[ed] to set forth the time, place, and manner in which any specific predicate act occurred" and the allegations in the complaint "provide[d] no basis in fact upon which the Court could conclude that any specific act of any specific Defendants is indictable for mail or wire fraud." Id.
When assessed under the framework set forth in Ambrosia Coal and Brooks, the Complaint fails to state a RICO claim because it does not offer the specificity required by Rule 9(b). Plaintiffs contend that eight facts contained in the Complaint-two of which are not alleged as part of the RICO cause of action-satisfy Rule 9(b) : (1) the Atmel and Continental enterprise implemented unspecified countermeasures to correct the defective ACUs and informed customers of these countermeasures while failing to issue a warning or recall (DE 50 ¶¶ 8, 156); (2) Atmel made "material statements about the safety and reliability" of the defective ACUs between 2007 and 2008 (DE 50 ¶ 277)[21] ; (3) Continental shipped parts that contained the countermeasures to nonparty Chrysler via interstate mail without documenting the change in Chrysler's systems (DE 50 ¶¶ 8, 157); (4) Continental similarly shipped such parts without documenting the changes to Mercedes Benz and Honda (DE 50 ¶¶ 8, 157); (5) Continental issued a September 2009 press release regarding its "aim ... to improve vehicle passenger safety" including "[a]irbags and other safety systems" (DE 50 ¶ 176d)[22] ; (6) the enterprise became aware of unexpected deployments of airbags in vehicles containing the defective ACUs in 2011 but failed to disclose the full scope of the defect until early 2016 (DE 50 ¶¶ 9, 156); (7) the enterprise became aware of "additional cars" with defective ACUs in early 2015, but failed to disclose the full scope of the defect until *1235 early 2016 (DE 50 ¶¶ 11, 14); and (8) from 2008 to 2016, the Airbag Manufacturer Defendants "were in regular contact" about the defective ACUs (DE 50 ¶ 158).
Plaintiffs claim that these allegations support the Complaint's conclusory statement that "Airbag Manufacturer Defendants comprised and comprise an association-in-fact enterprise ... [with] the common purpose to conceal ... the defective [ACU] problems ... [which] was formed by at least 2008." (DE 50 ¶¶ 154-56). They argue that the Airbag Manufacturer Defendants "operated or managed" this enterprise because they knew about the defective ACUs and made public statements about the ACUs, yet did not institute a recall or warn authorities or the public about the defect. (DE 50 ¶¶ 8, 154-58). However, as in Brooks, the allegations pertaining to whether Airbag Manufacturer Defendants "operated or managed" an "enterprise" do not distinguish between Atmel and Continental and therefore fail to provide each with fair notice of the claims against them. For instance, Plaintiffs do not specify which Defendant implemented what countermeasures, when each Defendant became aware of the unexpected deployments of airbags in 2011, and when each Defendant became aware of "additional cars" with the defective ACUs in early 2015.
Even putting aside the lack of specificity about the conduct of each Defendant, these allegations also do not establish that a RICO "enterprise" existed. For example, the "regular contact" between Airbag Manufacturer Defendants from 2008 to 2016 does not mention who at each company was in contact, what they were in contact about, or when, where, and how[23] these communications occurred and constituted a part of the scheme. Thus, the Complaint presents almost no detail-let alone the precise detail required by Rule 9(b) -to support the notion that there was "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Ray, 836 F.3d at 1352 (quoting Boyle, 556 U.S. at 946, 129 S.Ct. 2237 ). Without such allegations, the Complaint does not establish that the Airbag Manufacturer Defendants "operated or managed" an "enterprise."
Next, Plaintiffs' allegations pertaining to the purported predicate acts-mail and wire fraud-also do not rise to the level of specificity required to state a civil RICO claim pursuant to Rule 9(b). Plaintiffs respond that the Complaint sufficiently describes two or more acts of mail or wire fraud by including allegations regarding the Airbag Manufacturer Defendants' "knowing shipment of defective goods, specific communications between them conspiring to conceal the defect, failure to timely disclose the defect to both NHTSA and the public, and active concealment of ongoing malfunctions after countermeasures were implemented." (DE 99 at 17; DE 100 at 24; see also DE 50 ¶¶ 6, 8, 17, 23, 156-58). However, the Complaint fails to specify who at Continental shipped what remediated parts to Chrysler, Mercedes Benz, or Honda; when or where these shipments occurred; or how these shipments constituted part of a scheme to defraud. That "Continental sent the ASIC" (DE 50 ¶ 6) it received from Mercedes Benz in January 2008 to Atmel is similarly unhelpful in that there is no description of what role this played in the alleged scheme.
Finally, the Complaint also states that Airbag Manufacturer Defendants breached *1236 a "duty to disclose" information to NHTSA and the public. But violation of the only statutory duty pled in the Complaint-the duty to disclose information to NHTSA pursuant to the Motor Vehicle Safety Act-cannot be a RICO predicate act. Ayres v. Gen. Motors Corp., 234 F.3d 514, 521-22 (11th Cir. 2000) (holding that the Motor Vehicle Safety Act, which established NHTSA, "was not meant to create the kind of duty, a breach of which would create ... civil liability under our RICO statute."). Further, Plaintiffs never allege what each Airbag Manufacturer Defendant stood to gain from the alleged acts of mail and wire fraud or how those acts deceived Plaintiffs as opposed to vehicle manufacturer clients. Finally, the Complaint fails to describe sufficiently the nature or content of the public statements or internal communications that allegedly aided the Airbag Manufacturer Defendants' concealment of the defective ACUs. Consequently, the Complaint does not allege a "pattern" of "racketeering activity" pursuant to Rule 9(b) and cannot support Plaintiffs' RICO claim. Accordingly, the Court dismisses Count 3 of the Complaint.
iii. Remaining State Law Claims
Without a surviving RICO claim on which to base pendent personal jurisdiction, the Court cannot consider Plaintiffs' remaining state law claims. "Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction." Action Embroidery, 368 F.3d at 1180-81. No federal claims over which the Court has nationwide personal jurisdiction remain, and the Court is therefore without an independent basis to exercise personal jurisdiction over the remaining state law claims against the Airbag Manufacturer Defendants. Accordingly, the Court dismisses the Complaint's remaining state law claims against Airbag Manufacturer Defendants. Koch, 847 F.Supp.2d at 1378 ("having found that Plaintiffs claim under the RICO Act must be dismissed, the Court must also dismiss the state law claims" when unable to independently establish personal jurisdiction with respect to those claims); Prou, 62 F.Supp.3d at 1374 ("If the only jurisdictionally sufficient claim is dropped or dismissed, particularly if that occurs early in the litigation, the pendent claims should be dismissed as well.") (quotation marks and citation omitted); Tulsa Cancer Inst., PLLC v. Genentech Inc., No. 15-CV-157-TCK-TLW, 2016 WL 141859, at *4 (N.D. Okla. Jan. 12, 2016) ("The doctrine of pendent personal jurisdiction does not negate Plaintiffs' obligation to establish jurisdiction based on the relationship between Defendant, the forum, and each Plaintiff's claims."); Demaria v. Nissan N. Am., Inc., No. 15 C 3321, 2016 WL 374145, at *7-8 (N.D. III. Feb. 1, 2016) (declining to exercise pendent personal jurisdiction over claims of out-of-state Plaintiffs unrelated to Defendant's actions in Illinois).
IV. CONCLUSION
For the foregoing reasons, it is ORDERED AND ADJUDGED that MBUSA's motion to dismiss (DE 78), Honda's motion to dismiss (DE 82), Atmel's motion to dismiss (DE 83), and Continental's motion to dismiss (DE 83) are GRANTED. Plaintiffs' motion for limited relief from the discovery stay to produce public documents (DE 139) is DENIED AS MOOT. This case is set for a status conference on April 18, 2017 at 10:00 a.m.
DONE AND ORDERED in chambers in Miami, Florida, this 17th day of March, 2017.

Defendant Daimler AG moved for an extension of time to file a responsive pleading (DE 141) and the Court granted Daimler AG's motion through an order dated December 29, 2016 (DE 143). Daimler AG shall file a responsive pleading within 30 days after any amended complaint is filed pursuant to this Order.

Neither the Parties nor the NHTSA report referenced in the Complaint (DE 50 ¶ 6 n.2) explain why the power supply component is abbreviated "ASIC."

Plaintiff Lourdes Leon, a resident and citizen of Miami-Dade County, Florida, "purchased a 2009 Mercedes Benz C Class, VIN WDDGF54X49R054322, in the state of Florida" (DE 50 ¶ 29) and learned about the airbag recall in December 2015 (DE 50 ¶ 30). Plaintiff Alexander Paz, a resident and citizen of Miami-Dade County, Florida, "purchased a 2008 Mercedes Benz C Class, VIN WDDGF56X38F107492, in the state of Florida" (DE 50 ¶ 32) and learned about the airbag recall in December 2015 (DE 50 ¶ 33). Plaintiff Seth Burack, a resident and citizen of Palm Beach County, Florida, "purchased a 2009 Honda Accord, VIN JHMCP26379CO17006, in the state of Florida" (DE 50 ¶ 35) and learned about the airbag recall in 2016 (DE 50 ¶ 36). Plaintiff Nuria Reina, a resident and citizen of Miami-Dade County, Florida, "purchased a 2009 Honda Accord, VIN 1HGCP26829A121428, in the state of Florida" (DE 50 ¶ 38) and learned about the airbag recall in 2016 (DE 50 ¶ 39). Plaintiff Giraldo Hernan-Mejia, a resident and citizen of Bergen County, New Jersey, "purchased a 2010 Honda Accord, VIN 1HGCP2F8XAA049947, in the state of New York" (DE 50 ¶ 44) and learned about the airbag recall in or about December 2015 (DE 50 ¶ 45). Plaintiff Chrystina Asman, a resident and citizen of Macomb County, Michigan, "purchased a 2009 Chrysler Town and Country, VIN 2A8HR54119R63000, in the state of Michigan" (DE 50 ¶ 47) and learned about the airbag recall in February 2016 (DE 50 ¶ 48). Plaintiff Kimberly Battle, a resident and citizen of Washtenaw County, Michigan, "purchased a 2009 Chrysler Town and Country, VIN 2A8HR44E79R503185, in the state of Michigan" (DE 50 ¶ 50) and learned about the airbag recall in February 2016 (DE 50 ¶ 51). Plaintiff Kristen Ward, a resident and citizen of Suffolk County, New York, "purchased a 2009 Honda Accord, VIN 1HGCP26839A196302, in the state of New York" (DE 50 ¶ 53) and learned about the airbag recall in December 2015 (DE 50 ¶ 54). Plaintiff Donald Galloway, a resident and citizen of Palm Beach County, Florida, "purchased a 2008 Honda Accord, VIN 1HGCP36888A020141, in the state of Florida" (DE 50 ¶ 62) and learned about the airbag recall in or about December 2015 (DE 50 ¶ 63). Plaintiff Jocelyn Cintron, a resident and citizen of Palm Beach County, Florida, "purchased a 2009 Honda Accord, VIN 1HGCP26449A194748, in the state of Florida" (DE 50 ¶ 65) and learned about the airbag recall in or about December 2015 (DE 50 ¶ 66). Plaintiff Colleen Morrow, a resident and citizen of Palm Beach County, Florida, "purchased a 2009 Mercedes Benz C Class, VIN WDDGF54X09R081341, in the state of Florida" (DE 50 ¶ 68) and learned about the airbag recall in or about December 2015 (DE 50 ¶ 69). Plaintiff Melissa Munoz-Ortiz, a resident and citizen of Palm Beach County, Florida, "purchased a 2009 Chrysler Town and Country, VIN 2A8HR64X48R631797, in the state of Florida" (DE 50 ¶ 71) and learned about the airbag recall in or about December 2015 (DE 50 ¶ 72). Plaintiff Glenda Johnson, a resident and citizen of Orleans Parish, Louisiana, purchased a 2009 Dodge Journey, VIN 3D4GG57V99T230888, in the state of Louisiana" (DE 50 ¶ 74) and learned about the airbag recall in or about March 2016 (DE 50 ¶ 75). The Complaint names three additional Plaintiffs who purchased Honda vehicles. However, as Plaintiffs stated in their opposition to Honda's motion to dismiss (DE 98 at 11 n.8) and conceded at the hearing held September 9, 2016 (DE 133 at 85:16-19), Angel Henriksen, Maria McArdle, and Manuela Valentina Churi Hernandez lack standing to proceed because their Honda-manufactured vehicles do not contain the defective ACUs. Accordingly, these three Plaintiffs' claims are dismissed.

Plaintiffs argue that "Honda does not appear to contest that ... Plaintiffs purchased" their vehicles from "Honda-affiliated dealerships in Florida or otherwise relied to their detriment on [Honda's] misrepresentations in Florida." (DE 98 at 6). This "straw-man" argument ignores the fact that Plaintiffs-not Honda-bear the burden of establishing a prima facie case of personal jurisdiction. See Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 (11th Cir. 2006) (citing Meier ex rel. Meier v. Sun Int'l Hotels, Ltd., 288 F.3d 1264, 1268-69 (11th Cir. 2002) ).

Plaintiffs respond in their briefing with additional bases for jurisdiction that are not included in the Complaint-they assert that "Honda distributes, sells, warrants, and services Honda-manufactured vehicles in Florida and regularly concedes personal jurisdiction for claims arising from use of Honda-manufactured vehicles in this district." (DE 98 at 6). Even assuming the Court were to consider these additional statements supporting personal jurisdiction, they are arguably insufficient. For example, contacts such as consent to jurisdiction in other lawsuits do not support general personal jurisdiction pursuant to Florida's long-arm statute. See Carmouche, 789 F.3d at 1204.

Plaintiffs do allege generally that all "Defendants ... conduct substantial business in this District." (DE 50 ¶ 26). However, the Complaint contains no detail to support this statement as to Honda, leaving the Court unable to infer which of Honda's contacts with Florida support specific personal jurisdiction pursuant to Section 48.193(1)(a)(1).

It is well settled that allegations of economic injury alone do not establish the type of injury to persons or property within Florida required to establish personal jurisdiction pursuant to Section 48.193(1)(a)(6). See Courboin v. Scott, 596 Fed.Appx. 729, 734 (11th Cir. 2014) (citing Aetna Life & Cas. Co. v. Therm-O-Disc, Inc., 511 So.2d 992, 994 (Fla. 1987) ). Instead, this provision of the long-arm statute " 'contemplate[s] personal injury or physical property damage' within the State of Florida." Aetna, 511 So.2d at 994 (interpreting predecessor to Fla. Stat. § 49.193(1)(a)(6) ); accord. Hatton v. Chrysler Canada, Inc., 937 F.Supp.2d 1356, 1364 (M.D. Fla. 2013) (applying predecessor to Fla. Stat. § 48.193(1)(a)(6) to exercise personal jurisdiction where plaintiffs sued after suffering physical injuries during accident); Reflection Mfg., LLC v. I.S.A. Corp., No. 6:10-CV-1951-ORL, 2011 WL 972570, at *9 (M.D. Fla. Mar. 18, 2011) (citations omitted).

In their response to Honda's motion to dismiss, Plaintiffs suggest that the Complaint alleges that the Florida Plaintiffs bought or leased Honda vehicles from "Honda's agents in Florida." (DE 98 at 8). A review of the Complaint, however, reveals no such allegations.

Because the Court is unable to exercise personal jurisdiction over Florida Plaintiffs' claims against Honda, there is no basis for the Court to exercise pendent personal jurisdiction over the New York and New Jersey Plaintiffs' claims against Honda-which bear no apparent "stream of commerce" connection to Florida at all. Prou v. Giarla, 62 F.Supp.3d 1365, 1374 (S.D. Fla. 2014) ("If the only jurisdictionally sufficient claim is dropped or dismissed, particularly if that occurs early in the litigation, the pendent claims should be dismissed as well.") (quotation marks and citation omitted).

MBUSA also invites the Court to dismiss Plaintiffs' claims in deference to NHTSA's ongoing investigation pursuant to the doctrines of preemption and primary jurisdiction. As to preemption, MBUSA cites cases in which courts dismissed plaintiffs' requests for court-ordered recalls. See , e. g. , In re Bridgestone/Firestone Inc., ATX, ATX II & Wilderness Tires Products Liability Litigation, 153 F.Supp.2d 935 (S.D. Ind. 2001) ; Cox House Moving, Inc. v. Ford Motor Co., CA No. 7:06-1218-HMH, 2006 WL 2303182, at *8-9 (D.S.C. Aug. 8, 2006) ; Lilly v. Ford Motor Co., No. 00 C 7372, 2002 WL 84603, at *5-6 (N.D. Ill. Jan. 22, 2002). As to primary jurisdiction, MBUSA cites cases in which plaintiffs moved for equitable relief that would have conflicted with a NHTSA-supervised recall through which NHTSA was deploying its regulatory expertise. See Silvas v. Gen. Motors, LLC, No. 2:14-CV-89, 2014 WL 1572590, at *3 (S.D. Tex. Apr. 17, 2014) ; Bussian v. DaimlerChrysler Corp., 411 F.Supp.2d 614, 628 (M.D.N.C. 2006) ; Coker v. DaimlerChrysler Corp., No. 01 CVS 1264, 2004 WL 32676, at *5 (N.C. Super. Jan. 5, 2004). These arguments are persuasive to the extent that Plaintiffs request injunctive relief-including a declaration that the defective ACUs are in fact defective and an injunction directing Defendants to permanently, expeditiously, and completely repair all defective vehicles to eliminate the defective ACUs (DE 50 at 68-69)-that is redundant to the NHTSA-supervised recalls of Mercedes Benz vehicles described in the Complaint. (DE 50 ¶¶ 82, 85). However, because the scope of the relief Plaintiffs request exceeds the discernable scope of the NHTSA investigation, and because Plaintiffs' claims are subject to dismissal for other reasons, the Court declines to apply the doctrines of preemption or primary jurisdiction to dismiss the Complaint at this juncture. See Sanchez-Knutson v. Ford Motor Co., 52 F.Supp.3d 1223, 1238-39 (S.D. Fla. 2014) (declining to dismiss FDUTPA claim against vehicle manufacturer defendant on primary jurisdiction grounds after noting "heavy presumption against invoking primary jurisdiction"); Phillips, 2016 WL 693283, at *11-14 (declining to invoke primary jurisdiction doctrine to dismiss claims related to automobile defect where scope of relief requested exceeded scope of relief offered through NHTSA-supervised recall). The Court bases this decision in part on the absence of briefing on how Plaintiffs' causes of action may conflict with the objectives of the Safety Act or with NHTSA's ongoing investigation of the issues giving rise to this case. See Sanchez-Knutson, 52 F.Supp.3d at 1238-39 (declining to dismiss claims for injunctive relief pursuant to primary jurisdiction doctrine where defendant "has not identified any specific conflict between this action and the on-going NHTSA investigation of the same problem") (quoting Kent v. DaimlerChrysler Corp., 200 F.Supp.2d 1208, 1218-19 (N.D. Cal. 2002) ); Rosen v. J.M. Auto Inc., No. 07-61234-CIV, 2008 WL 9901501, at *2-4 (S.D. Fla. Mar. 6, 2008) (declining to dismiss claims for injunctive relief on preemption grounds after explaining operation of the Safety Act's preemption and savings clauses).

To the extent that Plaintiffs dispute application of Florida law to their MMWA claim, such application finds support in choice-of-law principles. In Florida, the lex loci contractus rule governs which state's implied warranty laws apply. Rose v. ADT Sec. Servs., Inc., 989 So.2d 1244, 1248 (Fla. 1st Dist. Ct. App. 2008) (holding that implied warranty claims are "action[s] in contract."). Plaintiffs Leon, Paz, and Morrow all obtained their vehicles in Florida. (DE 50 ¶ 29, 32, 58). Accordingly, Florida implied warranty law applies. See David v. Am. Suzuki Motor Corp., 629 F.Supp.2d 1309, 1316 (S.D. Fla. 2009).

Plaintiffs argue that privity is an affirmative defense which they are entitled to prove as fact at summary judgment. (DE 97 at 18). However, because the Florida law on which they rely requires privity of contract for the existence of an implied warranty, Plaintiffs' failure to allege sufficient facts to support privity is grounds for dismissal. See Cerasani v. Am. Honda Motor Co., 916 So.2d 843, 847 (Fla. 2d Dist. Ct. App. 2005) (affirming dismissal of breach of implied warranty claim where plaintiff failed to the allege privity of contract with automobile manufacturer defendant); Rentas v. DaimlerChrysler Corp., 936 So.2d 747, 751 (Fla. 4th Dist. Ct. App. 2006) (same). Here, there are no allegations that Plaintiffs purchased their vehicle from MBUSA.

Leon, Paz, and Morrow are all Florida residents who bought their vehicles in Florida. (DE 50 ¶¶ 29, 32, 68). Although they purport to bring Counts 2 and 5 of the Complaint against MBUSA on behalf of a "nationwide class," the Court evaluates the claim under Florida's law of fraudulent concealment.

The allegations Plaintiffs cite as demonstrating "particularity" include that "Defendants willfully failed to disclose and actively concealed the dangers and risks posed by the [defective ACUs]" and that "Defendants also engaged in unlawful trade practices by employing deception" (DE 50 ¶ 173); that "Mercedes Benz has known of the defect ... since at least 2008" (DE 50 ¶ 87); that had Plaintiffs known about this deception they "either would not have purchased their [d]efective [v]ehicles with [defective ACUs], or would have paid less for them than they did" (DE 50 ¶ 181). (DE 97 at 26). The Complaint also alleges generally that "Mercedes Benz also did not notify owners and lessees of Mercedes-Benz manufactured [vehicles containing the defective ACUs] until months" after notifying regulators and later advised that parts were not available (DE 50 ¶ 13); and that "Mercedes Benz initiated a campaign outside the U.S. to address" the defective ACUs in March 2013 (DE 50 ¶ 10) (emphasis in original).

Plaintiffs do not assert in either the Complaint or in briefing that Atmel or Continental is subject to general personal jurisdiction pursuant to Fla. Stat. § 49.193(2). Regardless, the facts do not support the theory that either Airbag Manufacturer Defendant had one of the "limited set[s] of affiliations with a forum [that] will render a defendant amenable to all-purpose jurisdiction" there. See Daimler, 134 S.Ct. at 760.

The mere presence of Atmel and Continental press releases on websites accessible in Florida does not establish personal jurisdiction pursuant to Florida Statute § 48.193(1)(a)(2) and the Due Process Clause of the Fourteenth Amendment. In Licciardello v. Lovelady, 544 F.3d 1280 (11th Cir. 2008), the Eleventh Circuit found that a Florida district court had specific personal jurisdiction over an out-of-state defendant who allegedly infringed the trademark of a Florida citizen on a website created by the defendant in another state. The Court found specific jurisdiction under Florida Statute § 48.193(1)(b) (current version at Florida Statute § 48.193(1)(a)(2) ) because the alleged tortious conduct occurred in Florida "by virtue of the website's accessibility in Florida." Id. at 1283 (emphasis added). Here, however, Plaintiffs' alleged injuries in Florida do not flow from the accessibility in Florida of the press releases on Atmel and Continental's websites, but from the presence of the allegedly defective ASICs and ACUs in Plaintiffs' vehicles. Moreover, in finding personal jurisdiction pursuant to Fla. Stat. § 48.193(1)(a)(2) in Louis Vuitton Malletier, S.A. v. Mosseri, 736 F.3d 1339 (11th Cir. 2013), the Eleventh Circuit appeared to retreat from the position that the Florida accessibility of an allegedly infringing website is alone sufficient to confer personal jurisdiction. In Mosseri the defendant was the CEO of a company that owned a website which was "not only accessible" in Florida like the website in Licciardello, but also facilitated the sale of allegedly infringing goods to Florida customers. Id. at 1354.

It should be noted that five out-of-state Plaintiffs who have no discernable connection to Florida are also bringing claims against Atmel or Continental.

Importantly, the Eleventh Circuit in Panama noted the "distinction between what a plaintiff asserting jurisdiction must allege to survive a defendant's ... Rule 12(b)(2) motion on the one hand, and a defendant's 12(b)(6) motion on the other." Panama, 119 F.3d at 941 (citing IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1055-57 (2d Cir. 1993) ). As to 12(b)(2) motions, the Eleventh Circuit held that "[w]hen a jurisdictional motion to dismiss depends, as in this case, on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if 'the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy.' " Id. at 941 (quoting IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1055-57 (2d Cir. 1993) ). Thus, in cases such as this one involving Plaintiffs' assertion of rights based on the federal RICO statute, the threshold for dismissal pursuant Rule 12(b)(2) is higher than the threshold for dismissal pursuant to Rule 12(b)(6). Compare Panama, 119 F.3d at 941with Twombly, 550 U.S. 544, 127 S.Ct. 1955.

Independent of these four elements, the Complaint must also show that Plaintiffs have standing to bring a RICO claim by alleging "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." Williams, 465 F.3d at 1282-83 (11th Cir. 2006). Airbag Manufacturer Defendants argue that because the Complaint's RICO claim requests "diminished value" damages (DE 50 ¶ 164a, 164b), and because no Plaintiff has yet sold their vehicle or had a vehicle that manifested a defect, the Complaint does not allege the requisite injury to business or property. They also contend that the ACUs themselves caused the diminishment of value in Plaintiffs' vehicles-not any alleged scheme to conceal that the ACUs were defective. Plaintiffs respond that they suffered injury the moment they purchased or leased their vehicles under the false pretense that the vehicles had fully operational ACUs. (DE 99 at 20). They point to the Complaint's statement that these purchases or leases were the "direct and proximate result" (DE 50 ¶ 164) of Atmel and Continental's failure to disclose the defective ACUs as required by the Safety Act-an assertion in significant tension with the Eleventh Circuit's holding that the Safety Act "was not meant to create the kind of duty, a breach of which would create ... civil liability under our RICO statute." Ayres v. Gen. Motors Corp., 234 F.3d 514, 521-22 (11th Cir. 2000). Finally, Plaintiffs claim that the damages that resulted from their injuries-i.e., their overpayments at the time of sale or lease-are recoverable under RICO. The Court observes that Plaintiffs' theories of RICO injury and causation do not follow clearly from the Complaint or from applicable case law. Nonetheless, because the Complaint fails to state the four elements of a RICO claim even assuming that Plaintiffs had standing, the Court declines to reach the RICO standing issue at this juncture.

Plaintiffs cite a Second Circuit case for the proposition that "allegations regarding the existence of an 'enterprise' are not subject to Rule 9(b)." (DE 99 at 16). They claim that their generalized allegations about the Airbag Manufacturer Defendants' use of the mails and wires are therefore sufficient to show an "enterprise" for purposes of stating a RICO claim. They similarly argue for the lenient application of Rule 9(b) to their allegations on a "pattern of racketeering activity" because Plaintiffs "do not know all the ongoing actions of Atmel and Continental, but clearly allege 'there is a substantial threat that the activities will continue in the future.' " (DE 99 at 18-19; DE 50 ¶ 163); see also Hill v. Morehouse Med. Assocs., No. 02-14429, 2003 WL 22019936, at *3 (11th Cir. Aug. 15, 2003) ("Rule 9(b)'s heightened pleading standard may be applied less stringently, however, when specific 'factual information [about the fraud] is peculiarly within the defendant's knowledge or control."). However, the Court does not agree that generalized, nonspecific, or conclusory statements about an enterprise or pattern of racketeering activity can overcome settled principle in the Eleventh Circuit that civil RICO claims, "which are 'essentially a certain breed of fraud claims, must be pled with increased level of specificity.' " Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283 (11th Cir. 2010) (quoting Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1316 (11th Cir. 2007) ). Adoption of the Second Circuit rule would also nullify the important purpose underlying Rule 9(b) -"alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." United States ex. rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301 (11th Cir. 2002). Accordingly, the Court holds Plaintiff's entire RICO claim to the heightened specificity required by Rule 9(b) and the applicable Eleventh Circuit case law. See Ray, 836 F.3d at 1348-49.

This allegation is not specific to Plaintiffs' RICO claim, but instead corresponds to Plaintiffs' separate claim against Atmel pursuant to California's Consumer Legal Remedies Act.

This allegation is not specific to Plaintiffs' RICO claim, but instead corresponds to Plaintiffs' separate claim against all Defendants pursuant to FDUTPA.

Plaintiffs' briefing suggests that Atmel and Continental were in contact "by email and mail" (DE 99 at 18) but the paragraph of the Complaint that Plaintiffs cite in support (DE 50 ¶ 158) features no such allegations.